LOTTINGER, Judge.
This is a tort action arising out of a collision between an automobile and a pickup truck which occurred at approximately 10:30 p. m. on January 18, 1957. The plaintiff alleges in his petition that just previous to the accident he was riding as a guest passenger in a car which was proceeding west on what is known as the “Stretch Road” in the Parish of Tangipahoa and that as the driver of the car attempted to pass a pickup truck (after having first blinked his lights and sounded his horn) the truck, with no warning whatever, turned to the left in the path of the overtaking automobile. The defendants are S. J. Bennett and Ernest L. Singleton, individually and as administrator of the estates of their minor sons, S. J. Bennett, Jr. and Ernest L. Singleton, Jr.
The lower court rendered judgment in favor of the plaintiff and against Ernest L. Singleton in the amount of $3500 reserving the rights of Charity Hospital at New Orleans for the amount of its bill for treatment of the plaintiff. The demands against S. J. Bennett were dismissed. The defendant Singleton has appealed and the plaintiff has answered the appeal asking that the judgment be increased to the amount orig-inálly prayed for, namely $46,082.87.
*128 The trial judge rendered written reasons for judgment which we herewith set out in full:
“This suit was tried and submitted and the court rendered judgment after personally viewing the scene of the accident, notifying counsel that a motion for rehearing would be entertained for the purpose of introducing in evidence measurements to be taken at the scene. Thereafter the court and both counsel, accompanied by the court stenographer, went to the scene and counsel took various measurements in the presence of the court, which were dictated to the stenographer and filed in the record.
“Counsel for defendant, Singleton, later informed the court he thought he had some newly discovered evidence, but later submitted his brief without further mentioning the matter of newly discovered evidence.
“After carefully reconsidering all evidence produced at the original trial and considering all evidence submitted on rehearing as to the measurements made at the scene, the court renders judgment for the following reasons as hereinafter set out.
“This is a suit for injuries alleged to have been suffered by a guest passenger in an automobile driven by Leon Hampton, in a collision between the Hampton automobile and a pickup truck owned by S. J. Bennett and driven by Lynn Singleton, minor son of Ernest L. Singleton. Named as defendants are S. J. Bennett and Ernest L. Singleton.
“Although S. J. Bennett was owner of the truck involved in the accident, no member of his family or any one else for whom Mr. Bennett was legally responsible was in the truck or anywhere near it at the time of the accident, and there is no evidence that Mr. Bennett or his minor son were negligent in permitting Lynn Singleton to drive the truck. For these reasons, which were orally announced in open court at the completion of the trial, the court dismisses plaintiff’s action as against Mr. Bennett.
“Now taking up the question of Mr. Singleton’s liability, the following facts and the laws applicable thereto are pertinent:
“There is no dispute about the fact that the driver of the pickup truck was the son of defendant, Ernest L. Singleton, that he was born June 11, 1941, and was therefore 15 years old at the time of the accident, and that this defendant was responsible for the torts of this minor son under [LSA-]RCC. [art.] 2318.
“Plaintiff was a guest passenger. Therefore, contributory negligence by the driver of the vehicle in which he was riding cannot be attributed to him unless he was in some way responsible for the vehicle or had control of it, or the negligence so wanton as to warrant intervention by plaintiff. The evidence shows that the car in which plaintiff was riding was owned and operated by Leon Hampton, and that plaintiff was riding on the left side of the rear seat, and had no particular responsibility for the operation of the car.
“Therefore, the only way defendant can avoid liability for this accident is to prove that the sole and only cause of the accident was the negligence of the driver of the automobile in which plaintiff was riding, and that defendant’s son was free from any negligence that contributed to the accident.
“In determining whether or not there was negligence on the part of defendant’s son, we will first consider the testimony of the two boys in the truck in the light of the physical facts as testified by other defense witnesses and *129 as revealed by measurements, etc., at the scene of the accident.
“The accident occurred in front of Ardillo’s, at about 10:30 p. m. on January 18, 1957.
“Ardillo’s is a combination of businesses all in one building, located on the south side of what is locally termed ‘the stretch road,’ being blacktopped State Highway 16, about a mile and a half west of Amite in Tangipahoa parish. The Ardillo building faces north toward Highway 16. In the eastern section of it is a restaurant, then a bar in the middle, and a grocery store in the west portion, with gas pumps in front of the grocery.
“The front of the grocery is set back further from the highway than the bar and restaurant part, leaving space for the gas pumps which are situated about the same distance from the highway as the front of the restaurant and bar portions of the building. Two small rectangular entries, one leading to the bar and one to the restaurant, with a row of iron stops to protect the front of the building and ■ furnish a narrow walkway serve to extend the restaurant and bar slightly further toward Highway 16, than the gas pumps.
“Another state road running south from Highway 16, known as the Pules-ton Road, runs along the east side of the Ardillo building. This Puleston Road does not cross Highway 16, but there is another road leading north from Highway 16 a short distance further east, thus there is no cross road at this point.
“Lynn Singleton who was driver of the pickup, and his companion of about the same age, Wilton “Buck” McDaniel, were the only ones in the truck. They both testified that they had been traveling about 50 to 55 mph, approaching Ardillo’s; that they had slowed down knowing that they were going to stop there to wait for somebody; that just before starting to turn left across the highway toward Ardillo’s they were traveling about 5 mph, and that they had slowed down so gradually that they had not applied the brakes; that the night was clear and cold; and the cab windows were up. Both boys stated they looked back, saw a car approaching from their rear a good ways back, that Lynn rolled his window down, made a signal with his arm and turned left off the highway.
“In giving his first version of the accident, Lynn stated he and his companion both looked back, saw a car approaching which he judged to be back about to the barber shop, then he rolled down his glass, gave a signal with his arm, rolled the glass back up and made his turn. (T. 89) He later reiterated this same sequence, stating that he looked back, then rolled the glass down, gave his signal and rolled the glass right back up (T. 93 and 94), but then stated he didn’t pull his arm back in until after he made the turn.
“The testimony of Wilton McDaniel is not quite as clear as to the sequence of these events. He stated that they both looked back first (T. 102), then the window was rolled down, but it appears from his testimony that the act of looking back and turning the glass down for the signal were almost simultaneous. (T. 109) He is quite positive that the glass was not rolled back up until they were in the process of turning. This glass was entirely up at the time of the impact.
“McDaniel also fixes the location of the truck on the Highway at the time the window was rolled down to give the signal, as ‘just passing the road’ (evidently referring to the Puleston road) (T. 109). This distance was later fixed by measurements by court *130 and counsel at ISO feet from point of impact.
“Both boys stated they did not again look back after this one backward look, when they saw this vehicle behind them. While Nick Ardillo, who was the first person to reach the scene immediately after the accident, testified that these boys both told him they had looked back and had seen nothing whatever (T. 118 and 120), both of the boys testified at the trial of seeing the approaching vehicle at a point they took to be in front of Genco’s barber shop, a distance which Lynn estimated to be 250 yards. (T. 90)
“Both boys insisted that they had entirely completed their turn, had come to a complete stop right up close to the gas pumps, that the ignition key had been turned off and McDaniel had already started to open the door to get out when the crash came. They judged the time that elapsed from the time they stopped until the crash occurred to be ‘one or two seconds,’ ‘several seconds’ or ‘three or four seconds.’ (T. 89 and 101)
“The court believes this lapse of time to have been impossible in the light of other circumstances as hereinafter observed, and the testimony of Mrs. Chapman which indicates the appearance of the truck and the sound of the crash to have been almost simultaneous.
“The only vehicle parked on the north side of the Ardillo building at the time of the crash was the car in which Mrs. Chapman was sitting with her children. This car was parked immediately in front of the entrance to the bar, and all the testimony shows it was headed straight in toward the building.
“Nick Ardillo testified that he observed skid marks beginning at about the west edge of the Puleston road, where it enters Highway 16, and extending to the point of impact. These skid marks he described as making a straight line from this point of starting, running directly to the point of impact, right up to the Hampton car. There seems to be no doubt they were made by the Hampton car. This witness had measured this distance the next day after the accident, by stepping it off, and stated it to be between 100 and 125 feet, and other witnesses described this stepped-off distance to be between 120 and 125 feet.
“These skid marks have been variously described by witnesses as being some 4 to 10 feet behind the Chapman car. (T. 115, 124 and 133). Therefore, the Hampton car missed the Chapman car by 4 feet, according to the closest estimate, or 10 feet, according to the farthest estimate.
“The Puleston road runs along the east side of the Ardillo building. At the time of the accident this road was graveled, but the entire area north of the Ardillo building and extending to this road, was blacktopped. Since it is apparent that the skid marks were all on blacktop, and it has been testified that they started about the point where this side road comes into the highway, these skid marks evidently started in the south lane of the highway.
“While there is nothing in the evidence to show what kind of car the parked Chapman car was, at the time the court and counsel observed the scene, counsel agreed that it was a 1949 Studebaker. Counsel further agreed that, in view of the fact that the Chap-mans had come from the west, their car might have been parked at a slight angle, even though all the testimony is that it was parked ‘straight in’ toward the bar. .
“It was observed by court and counsel that, even though the parked car was a *131 small Studebaker, and even if it had been parked at an angle, it would still have been impossible for the Hampton car, coming in a straight line from the south edge of Highway 16, some 100 to 125 or even 150 feet back from the impact, and missing the Chapman car between four and ten feet, to have struck the truck if it had been parked up by the gas pumps, as testified by the boys in the truck. Further evidence that the truck was not parked up next to the gas pumps is shown by the evidence of the debris and spilled oil which was back half way between the gas pumps and the edge of the highway.
“It was further observed at the scene of the accident that a car of ordinary width, making skid marks which missed the Chapman car by from four to ten feet, could have been still on the highway or at the very most just slightly off of it, at the time it passed behind the Chapman car.
“The variance of testimony of the witnesses as to the depth of the parking area, the distance of the skid marks from the highway, distance of the point of impact from the highway, etc. is explained by the fact that at this point there is a large blacktopped area on both sides of the highway, in front of Ardillo’s on the south, and in front of a filling station on the north; the limits of the highway are not clearly defined and the edge of the pavement can be accurately determined only by sighting up and down the road beyond these parking areas to a point where the shoulders are distinguishable. This would be difficult to do at night when this accident occurred.
“While the distance from Genco’s Barber Shop to a point on Highway 16 directly in front of the gas pumps was not measured at the time the court and counsel made these other measurements, it was agreed that the speedometer measurement previously made, fixing the distance at one-tenth of a mile, was correct. This would be a distance of 528 feet.
“According to the Highway Department’s speed chart an automobile traveling 50 mph is traveling 74 feet per second, and at 60 mph it is traveling 88 feet per second and further, that if the driver has normal reactions, his car will travel 55 feet or 66 feet, respectively, at the above speeds, before he can get his foot on the brake, or a time of about •J^ths of a second.
“With these figures in mind, it would have taken the Hampton car approximately 5i^ seconds at 50 mph, or 4Yz seconds at 60 mph, from the time the boys first saw it until it reached the point where the driver actually applied his brakes 100 or 125 feet from the impact where he actually started skidding, according to those who measured these skid marks.
“If as McDaniel stated, the truck was passing the Puleston road at the time they looked back and Lynn began rolling down his window, this truck, moving at a very slow speed slowing down to make a turn, would have to travel some 125 to 150 feet to the place where it actually began its turn, while the Hampton car was traveling approximately 400 to 425 feet, from the barber shop to the point where he applied his brakes, in order for these vehicles to reach these respective locations simultaneously.
“At 20 mph, a vehicle is making 29 feet per second, and the truck was slowing down until it was making an estimated 5 mph, which is approximately 7 feet per second. Therefore, the truck may even have already passed the Pule-ston road when the Hampton car was sighted back by the barber shop. In any event, the Hampton car had ample time, even at less than 50 to 60 mph, to travel 400 to 425 feet to the point it *132 started skidding, during the same time the pickup truck, at the much slower speed, was traveling some ISO feet or perhaps 100 feet. The court, therefore, feels justified in assuming that the Hampton car had just about reached the Puleston road by the time the truck started its turn. Since the skid marks began in the south lane (which is the passing lane for west bound traffic) it is reasonable to also assume that Hampton was already over in this passing lane when he saw the truck begin its turn,
“That the truck made an abrupt, straight-in, turn, rather than a long sweeping turn off the highway, is borne out by the fact that it received the blow straight into its side.
“It is recognized that the act of turning left off a highway is one of the most dangerous maneuvers a vehicle can make, and a driver is charged with positively ascertaining that the turn can be made with safety before attempting it.
“Therefore, under the facts as shown in this case, the court is of the opinion that the driver of this pickup truck was negligent in the following respects:
“In attempting such a turn several seconds after observing a vehicle behind him at a distance which he should have judged could be traversed in a very few seconds at a speed which was lawful in the area;
“In not again looking back to see just where the following vehicle was at the instant he was to make his turn, although several seconds is bound to have elapsed from the time he first saw it;
“And that this negligence was the proximate cause of the accident.
“While the driver of the Hampton car may have been negligent to some extent in not seeing the arm signal, this possibility is considered in the light of the following proved facts:
“The pickup was equipped with a single tail light and some luminous tape on the end gate which would warn a following vehicle only of its presence in the road traveling straight ahead. The truck had no directional turning lights, and since the truck’s slow-down was so gradual as not to require application of brakes, no brake lights appeared. The only warning of a turn was the extended arm which appeared very briefly if the driver’s first and repeated version of the accident is correct, that he turned down his glass, gave a signal and turned the glass right back up. Therefore, this would not be such contributory negligence as could possibly be imputed to a guest passenger.
“As to the speed of the Hampton car, it is admitted that this was a 60 mph speed zone. Comparing the distance this car traveled with the distance the slow moving truck traveled, in the few seconds preceding the impact, would not indicate excessive speed.
“Considering the Highway Department’s speed chart, which shows a 66-foot reaction time, plus 185-foot actual braking time to stop a car traveling at 60 mph, this car, if it had been traveling between 55 and 60 mph, would still pack considerable wallop even after skidding as much as 100 to 125 feet on smooth blacktop.
“Counsel for defendant has attached a chart to his last brief. Commenting upon this chart, the court calls attention to the fact that it is not drawn to scale, and creates some incorrect impressions as to comparative distances. Especially is this true of the sketched size of the pickup truck as compared to the small 1949 Studebaker automobile, giving an impression of much greater distance from the high *133 way than the evidence shows it was at the time of the impact. This chart also shows the Hampton car some 25 feet from the point of impact, and the truck some 40 feet beyond the car after the collision. This is not borne out by the testimony.
“Trooper Hayden testified that the Hampton car traveled ‘between 9 and 12 feet,’ or ‘about 10 feet,’ after the impact. (T. 154). This witness does not fix the distance the truck traveled after the impact, but he said it was over near the fence.
“Witnesses variously described this distance anywhere from the same distance from the Hampton car as the car was from the point of impact, on up to an estimated 50 feet. Since there is evidence that the fence is now not in the same location it was at the time of the accident, the court has no accurate knowledge of how far the truck moved after the impact, and could therefore not use it as a criterion to gauge the force of the blow or to indicate a greater speed for the Hampton car than 60 mph.
“Defendant’s counsel argues that, if the Hampton car had remained on Highway 16, instead of traveling toward the truck as it made the turn, the car would have passed behind the truck. This would come within the rule that a driver cannot be held responsible for the same degree of reflective judgment in an emergency as he would have been had he had time to weigh every possible contingency.
“Defendant’s counsel further contends that a speed of 55 to 60 mph, although not illegal, may have been unwise at this particular point at night. However, evidence shows that there was no other traffic on the road and only one other vehicle in the entire parking area north of Ardillo’s at the time. In any event it was not such reckless operation as to require the intervention of a guest passenger riding in the rear seat on the left, which is the position least available for viewing the speedometer of a vehicle.
“Therefore, the court can see no negligence that could possibly be imputed to this plaintiff-guest passenger.
“As to the quantum of damages, the testimony is undisputed that as a result of this accident, plaintiff lost the sight of his right eye by severance of the optic nerve and that this eye at the time of the trial still had excessive tears and discharge, and that this injured eye had not been removed nor an artificial eye provided; that plaintiff was in Charity Hospital in New Orleans for two months and ten days; that both legs were injured which resulted in one leg being in traction for about one month and the other in traction for about two months; that he underwent two operations, one for his eye and one for his hip; that he still suffers from his leg and that he had not been discharged from the hospital at the time of the trial.
“For injuries and disability of this kind the court believes the jurisprudence of this state may justify damages in the amount of the $15,000.00 urged by plaintiff’s counsel. However, the court believes iflself justified in considering the modest means of the defendant, and will reduce this amount to a judgment of $3,500.00 for personal injuries.
“As to the bill of Charity Hospital of Louisiana at New Orleans in the amount of $1,182.87, offered in evidence as P. 1, the plaintiff has not paid this bill and, under the provisions of [LSA-]R.S. 46:8-12, subrogation of plaintiff’s rights in connection with this bill has already taken place in favor of said hospital to recover this amount from the defendant. Therefore, the *134 rights of Charity Hospital, under this legal subrogation, are reserved to it herein. Notice of the trial of this suit not having been given to the said hospital as required by [LSA-] R.S. 46:9, the court has instructed the Clerk of this court to notify said hospital of the rendition of this judgment and the reservation of its rights herein.
“For the foregoing reasons, the court affirms the judgment previously rendered herein in favor of plaintiff Ervin Boyd and against the defendant, Ernest L. Singleton, in the sum of $3,500.00 and all costs of this proceeding, together with legal interest from judicial demand until paid, and reserving the rights of Charity Hospital of Louisiana at New Orleans against this defendant under its legal subrogation for the amount of its bill for treatment of plaintiff; and further renders judgment dismissing plaintiff’s demand as against the defendant, S. J. Bennett.”
A consideration of the record fails to disclose any manifest error in the lower court’s findings and we experience no difficulty in concluding that the driver of the truck was negligent in making a left turn without having ascertained that it could be made in safety.
Counsel for defendant argues that the lower court erred in refusing his motion for a new trial which was based on newly discovered evidence. We believe, as did the trial judge, that even if the matter were to be re-opened and the witnesses testified as alleged in the application the weight of the evidence would still be in favor of the plaintiff.
Lastly, counsel urges that it was error to reserve the rights of Charity Hospital as its claim had prescribed. We doubt the propriety of supplying a plea of prescription and think this defense could be more properly urged by way of defense when and if Charity Hospital seeks to enforce the judgment.
We find no manifest error in the judgment appealed from and the same is hereby affirmed.
Judgment affirmed.